ISHEE, J., for the Court:
¶ 1. In December 2007, Anthony (Tony) Joseph Cuccia moved out of the marital home he shared with Julie Anne Cuccia in Hernando, Mississippi. The Cuccias then began the legal process of dissolving their eleven-year marriage in the DeSoto County Chancery Court. Approximately two years later, the chancery court granted the divorce based on irreconcilable differences. The chancery court also issued a final order awarding Julie Anne sole custody of the Cuccias’ two children, subject to standard visitation rights granted to Tony. The chancery court concluded that Tony’s bonus he had received at work after the Cuccias’ separation was marital property and ordered Tony to pay Julie Anne half of the bonus. The chancery court further determined that a residence purchased by Julie Anne post-separation but acquired with and paid for, in part, by Tony’s temporary support payments, was Julie Anne’s separate property. Additionally, acreage owned by Tony and Julie Anne, as well as Tony’s parents, was determined to be marital property. The chancery court awarded the parties’ interest in the property to Tony and ordered him to pay Julie Anne one-half of the value of the parties’ interest in the property. After assessing the parties’ fiscal conditions and the marital estate, the chancery court also ordered Tony to pay Julie Anne $2,000 a month in alimony for forty-eight months. However, at no point in its analysis of the marital estate *29 did the chancery court address the marital debt. Aggrieved, Tony appeals. Finding error, we reverse and render the issues pertaining to child custody and visitation, affirm the issue of the Tennessee acreage’s value and reverse and remand on the remainder of the issues for further proceedings consistent with the findings of this opinion.
FACTS
¶ 2. Tony and Julie Anne were wed in November 1996. During the marriage, they had two children. The elder child was born in 1998, and the younger child was born in 2002. In December 2007, Tony moved out of the Cuccias’ marital residence and filed for divorce in the chancery court shortly thereafter. The case was originally assigned to Chancellor Mitchell M. Lundy Jr., but it was later reassigned to Chancellor Percy L. Lynch-ard Jr.
¶ 3. In March 2008, Tony filed a motion for a temporary restraining order requesting that he be granted sole temporary custody of the parties’ children. In his motion, Tony expressed concerns about the safety of his children in Julie Anne’s residence due to Julie Anne’s housing over thirty-six dogs, including Rottweilers and pit bulls, on the property and in the residence. Chancellor Lundy granted Tony sole custody of the children for approximately two weeks, until a hearing on the matter could take place.
¶ 4. At the hearing, Julie Anne testified that she ran a dog boarding and training business as well as a dog rescue operation on the marital property and in the residence. She testified at the time that she was housing thirty-six dogs on the property and in the residence. The menagerie included numerous Rottweilers and pit bulls. Furthermore, on one occasion, the record indicates that a Rottweiler on the property engaged in a fight with another Rottweiler at the residence, wherein the instigating dog brutally attacked the other animal with such viciousness that the dog was eventually euthanized for safety purposes.
¶ 5. Subsequently, the chancery court entered a temporary order granting Tony and Julie Anne joint legal and physical custody.: In the order; the chancery court granted Tony custody of the children three weekends per month from 6:00 p.m. on Friday until 6:00 p.m. on Sunday, as well as- every Tuesday evening from 4:00 p.m. until 8:00 p.m. The chancery court also enjoined Julie Anne from allowing more than three dogs to run loose or occupy any portion of the marital residence utilized by the family and the children. No dogs were allowed in the house weighing more than thirty pounds. However, Julie Anne was allowed to continue boarding animals of any number and any size in the garage portion of the residence, as long as the animals were penned or caged and separated from the rest of the home. The chancery court further allowed Julie Anne to continue boarding animals outside the house without restriction. The chancery court also ordered Tony to pay Julie Anne $500 a month in temporary support in addition to paying all mortgage payments, property insurance, property taxes, utilities, and for one tank of gas per week.
¶ 6. Approximately three months later, Chancellor Lundy recused himself, and the case was reassigned to Chancellor Lynch-ard. Five days after the reassignment, Julie Anne requested a modification of Chancellor Lundy’s temporary order. Julie Anne’s requests included the following: an upward modification of temporary support; a reduction of Tony’s visitation to two weekends a month; removal of all restrictions regarding the number and weight of dogs allowed in the residence; *30 an order requiring Tony to pay for all uncovered medical expenses; an order requiring Tony to pay all work-related bonus income he received into a trust; and an order requiring Tony to pay any money received by him regarding a then-existing personal lawsuit on file into a trust.
¶ 7. In response, the chancery court ordered Tony to place all bonus money he received into a trust, such that proper division of the money could be determined during the divorce proceedings. The chancery court also ordered Tony to pay Julie Anne $1,000 from the recent sale of a family tractor and $2,000 to aid in expenses she would incur when she moved from the marital home after the home was sold. The chancery court set a hearing regarding Julie Anne’s remaining issues.
¶ 8. At the August 27, 2008 hearing on Julie Anne’s remaining issues, the chancery court increased Julie Anne’s temporary support from $500 a month to $8,750 a month, and the court ordered Tony to pay Julie Anne’s attorneys’ fees in the amount of $832.50. The chancery court also ordered Tony to maintain health insurance on the children and Julie Anne, and the court further directed that any costs not covered by insurance should be divided equally between the parties. Finally, the chancery court stated that any provisions from the temporary order that were not addressed in the court’s August 27, 2008 order were to remain in full effect.
¶ 9. Sometime after the hearing and after the sale of the Cuecias’ marital home was final and the proceeds divided, Julie Anne applied for a loan to purchase a new home. The record reflects that on the loan application, Julie Anne asserted that her monthly income was between $8,750 and $6,500 a month. Julie Anne also acknowledged on the loan application that she was self-employed through her dog boarding and training business, and she stated that her monthly business expenses were approximately $1,700. The loan application does not include any reference to the $3,750 a month Tony was paying Julie Anne in temporary support. Accordingly, Julie Anne qualified for a $200,000 mortgage based solely on income she claimed to earn from her business. As such, Julie Anne purchased a home and subsequently moved herself and her children into the home.
¶ 10. Approximately two months after the hearing, Julie Anne petitioned the chancery court to hold Tony in contempt of court for failing to deposit into a trust a bonus check in the amount of $43,360, which Tony had received from work in July 2008. The chancery court granted Julie Anne’s motion and ordered Tony to deposit the money and pay Julie Anne’s attorneys’ fees in the amount of $1,500 for litigation of the matter. The record reflects that Tony’s bonus was based upon his company’s performance, and not upon his personal performance. The record also reflects that Tony historically paid off marital debt with bonuses he received from work, and he did so again with the money he received in July 2008. Included in the payments were part of the Cuccias’ children’s school tuition, mortgage debt on the marital residence, and other marital expenses. Because Tony had already paid the bonus money toward marital debt, he applied for and was granted several loans in order to comply with the chancery court’s order that he place the $43,360 into a trust.
¶ 11. Thereafter, Tony filed a motion for contempt with the chancery court concerning Julie Anne’s parenting of the parties’ children. Tony alleged that Julie Anne was withholding pertinent information regarding the children from Tony and was making important unilateral decisions about the children without consulting *31 Tony. Tony later filed an amended motion for contempt to include the fact that Julie Anne was violating the chancery court’s temporary order restricting the number and weight of dogs allowed in the marital residence by housing numerous Rottweilers and pit bulls in the home.
¶ 12. Furthermore, Tony alleged that Julie Anne’s responsibilities with the dogs located on the marital property was causing her to neglect the children. Specifically, Tony pointed out that one of the children was failing first grade due to Julie Anne’s neglect in adequately addressing the child’s academic needs and ensuring that the child arrived at school on time. Tony also asserted that Julie Anne was not properly tending to the children’s medical needs. Tony provided information indicating that one of the Cuccias’ children suffered from asthma and that Julie Anne had unilaterally decided to cease filling the child’s prescription medication, unbeknownst to Tony. Tony also offered documentation to the chancery court that the asthmatic child had not been taken in for follow-up appointments, as prescribed by the child’s doctor, and that until Tony’s recent cure of the problem, neither child had been provided a recommended annual wellness checkup in some time.
¶ 13. Shortly thereafter, on February 5, 2009, Tony petitioned the chancery court for a modification of custody and temporary support. The record reflects that Tony’s annual pay had been cut by approximately $75,000. Due to his pay decrease, Tony’s annual income approximated $129,000, and he was fiscally unable to maintain the $3,750 in temporary support payments to Julie Anne; the loan payments due on money Tony borrowed to place $43,360 into a trust; other monies paid to cover Julie Anne and the children’s living expenses such as utilities, property insurance, property taxes, medical insurance, the children’s tuition, and certain gas expenses for Julie Anne; and Tony’s own living expenses. Despite an initial hearing date of February 25, 2009, the chancery court ultimately decided against holding a hearing on the matter and instead set the case for trial. Accordingly, Tony’s concerns were not resolved until approximately eight months later, after the August 11, 2009 trial when the chancery court issued its final divorce decree and order on September 21, 2009.
¶ 14. Pursuant to the chancery court’s order, Julie Anne was granted sole physical and legal custody of the two minor children, and Tony’s visitation rights were drastically reduced from the prior temporary order. The chancery court used a standard schedule of visitation rights to allow Tony visitation every other weekend from 6:00 p.m. on Friday until 6:00 p.m. on Sunday; three holidays a year from 8:00 a.m. until 6:00 p.m. on the day of the holiday with the exception of Christmas holidays, wherein Tony was granted approximately one week a year; Father’s Day from 9:00 a.m. until 6:00 p.m.; three hours of visitation on each child’s birthday; and three two-week-long visitations during the children’s summer vacation in lieu of any weekend visitation rights during the summer-vacation period. Tony was also ordered to pay Julie Anne child support in the amount of $1,453 a month; the children’s tuition; the children’s health insurance; half of all medical expenses incurred on behalf of the children and not covered by health insurance; and to maintain life insurance on himself of at least $100,000, with the children listed as equal beneficiaries.
¶ 15. Additionally, the chancery court determined that Julie Anne was entitled to half of the money Tony had borrowed and deposited in a trust as a replacement for the bonus money he had received in July *32 2008 but had used to pay debt accrued during the marriage. The chancery court also concluded that Julie Anne’s new residence was separate property and not a part of the marital estate in any manner. Despite evidence on the record that Tony had paid over $61,000 to Julie Anne in temporary support since the commencement of the divorce and Julie Anne’s averment in her loan application that her self-employment garnered her anywhere between $3,750 a month and $6,500 a month, the chancery court determined that there was a “great disparity in income” between the parties and awarded Julie Anne $2,000 a month for forty-eight months in alimony, for a total of $96,000.
¶ 16. Julie Anne also received half of Tony’s retirement account, certain personal items accumulated during the marriage, the monetary equivalent of half of the value of a camper owned by the parties, and the monetary equivalent of one-half of the parties’ interest in acreage in Tennessee owned by Tony, Julie Anne, and Tony’s parents. In determining the value of the Tennessee property, the chancery court stated that the parties’ interest in the Tennessee property had a net equity of $45,237 and that Julie Anne was entitled to half of that amount. The chancery court declined to offer an explanation of how it reached this conclusion, but stated that its determination was based on amounts garnered from the parties’ agreed-upon appraiser. Nowhere did the chancery court specifically address the property’s debt, nor did the court appear to consider any of the parties’ marital debt in determining the total amount of the marital estate and Julie Anne’s award.
¶ 17. On appeal, Tony asserts the following: (1) the chancery court erred in awarding Julie Anne sole legal and physical custody of the Cuccias’ children; (2) the chancery court erred in only granting Tony standard visitation rights; (3) the chancery court erred in classifying Tony’s work bonus as marital property; (4) the chancery court erred in classifying Julie Anne’s residence as her separate property; (5) the chancery court erred in its valuation of acreage owned by Tony, Julie Anne, and Tony’s parents; (6) the chancery court erred in failing to acknowledge the parties’ marital debt and properly divide such debt; and (7) the chancery court erred in awarding Julie Anne $2,000 a month in alimony for forty-eight months.
STANDARD OF REVIEW
¶ 18. It is well settled that appellate courts are bound by a limited standard of review in domestic-relations matters. See, e.g., Ferguson v. Ferguson, 639 So.2d 921, 929 (Miss.1994). The Mississippi Supreme Court has held that a chancellor’s findings of fact, especially in domestic-relations cases such as the instant case, “will generally not be overturned by this Court on appeal unless they are manifestly wrong.” Fancher v. Pell, 831 So.2d 1137, 1140 (¶ 15) (Miss.2002) (citing Nichols v. Tedder, 547 So.2d 766, 781 (Miss.1989)). However, if a chancellor’s decisions are manifestly wrong, unsupported by substantial credible evidence, or based upon the application of an erroneous legal standard, the chancellor’s findings may be set aside on appeal. Id. (citation omitted).
DISCUSSION

I. Custody and Visitation

¶ 19. In his first assignment of error, Tony argues that the chancery court erred in granting Julie Anne sole legal and physical custody. Tony further asserts that the chancery court committed manifest error in reducing Tony’s visitation rights from those granted in the temporary order to more restricted visitation rights under *33 the standard Farese Visitation Schedule.[1] Because these issues are substantially interrelated, we address them together.
¶ 20. The law governing child custody is found in the landmark case of Albright v. Albright, 437 So.2d 1008 (Miss.1983). Albright emphasizes that the “polestar consideration in child custody cases is the best interest and welfare of the child.” Id. at 1005. The following factors were also provided for in Albright and continue to serve as guidelines when determining proper child custody:
[Age,] health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent[;] and other factors relevant to the parent-child relationship.

Id.

¶21. Although the chancery court’s analysis is very brief and often vague, we agree with the chancery court in its conclusions as to many of the aforementioned factors. However, we find that several of the chancery court’s conclusions and the court’s overall decision is manifestly wrong. The chancery court found that the three factors of “continuity of care,” “best parenting skills,” and “willingness to provide primary childcare” favored Julie Anne and that the remaining factors favored neither party. We disagree.
¶ 22. Regarding “continuity of care,” the chancery court found that Julie Anne had provided primary custodial parenting during the marriage, and the court noted that the children had lived with their mother in the marital residence for approximately three months after the parties’ separation in December 2007. However, the chancery court failed to point out that Tony obtained sole custody of the children for several weeks in early 2008, and from March 2008 until October 2009— over a year and a half — the parties shared joint legal and physical custody of the children.
¶ 23. The Mississippi Supreme Court has shown that the stability and continuity of a child’s home environment between the time of the parents’ separation and the entry of divorce is an important consideration when determining custody. See, e.g., Jerome v. Stroud, 689 So.2d 755, 757 (Miss.1997); Law v. Page, 618 So.2d 96, 102 (Miss.1993). Additionally, the record also indicates that Tony took an active role in the children’s lives prior to the separation. Small examples of Tony’s involvement prior to the separation include his role as his son’s soccer coach, his role as his daughter’s “communion sponsor,” and his regular attendance at the children’s extracurricular events. It appears that Tony continues to participate in his children’s lives to the extent possible given his custodial restrictions. Due to Tony’s ac *34 tive role in the children’s lives both before, during, and after the parties’ separation, we cannot find that the factor of “continuity of care” favors either party.
¶ 24. The chancery court further determined that Julie Anne exhibited the best parenting skills due to the same reasoning the chancery court used in concluding that Julie Anne would provide better continuity of care. We disagree with the chancery court’s reasoning for its conclusion that Julie Anne would provide better continuity of care than Tony. Consequently, we also disagree with the chancery court’s finding that Julie Anne retained the best parenting skills. After a complete review of the record, we find that neither party exhibits better parenting skills than the other.
¶ 25. The chancery court’s final determination in favor of Julie Anne concludes that she exhibited more of a willingness to provide primary childcare to the children. The chancery court reasoned:
This factor favors the natural mother inasmuch as the natural mother again exhibited the willingness and in fact the accomplishment of the care of the children. This is particularly true when the natural father left the marital residence and for a period of three months allowed the children to remain in the sole custody of the natural mother. Further, by allowing and consenting to the natural mother to be the joint legal and physical custodian of the children, the natural father affirms the willingness and ability of the natural mother to care for the children. This factor favors the natural mother.
¶ 26. The chancery court’s analysis is flawed for several reasons. First, the record reflects, and the chancery court admitted that “both parties are actively involved in the school and extracurricular activities of the children.” Likewise, the record indicates that Tony was an excellent parent at home as well. Accordingly, to hold that the accomplishments of the parties’ children are the result of Julie Anne’s efforts alone is a misstatement.
¶ 27. Second, while the chancery court notes that Tony allowed his children to live exclusively with Julie Anne for a period of time immediately following the parties’ separation, the court fails to mention that once the chancery court became involved in the parties’ dispute, the court almost immediately granted Tony sole legal and physical custody for a short time before ultimately granting joint custody to both parents. We cannot equate Tony’s willingness to allow his children to live in the home in which they were accustomed to living, and in the temporary care of their natural mother directly after the parties’ separation, to Tony’s unwillingness to care for his children.
¶ 28. Finally, the chancery court referenced the fact that Tony voluntarily consented to joint custody of his children with Julie Anne as evidence that Julie Anne was willing and able to care for the children. Under such reasoning, Julie Anne likewise agreed to joint custody with Tony and, therefore, provided evidence as to Tony’s willingness and ability to care for the children. Nonetheless, a parent’s desire to allow his child the opportunity to enjoy the presence of both parents in the child’s life should not later be used against the parent to support a theory that the parent is unwilling to care for the child. Simply because a parent in a child-custody case does not employ a take-no-prisoners strategy does not mean that the parent should be marked as unwilling to provide primary care for the child.
¶ 29. A review of the record supports Tony’s willingness to be a primary caregiver to his children. Although Tony is not self-employed as is Julie Anne, his job-flexibility is favorable, and he has ex *35 pressed an unequivocal desire to care for his children. At trial, Tony noted that he has no set work hours and, in fact, often works remotely from home. He is involved in his children’s lives and is familiar with their daily schedules and routines. Notable indications that Tony is willing to serve as a primary caregiver to his children include his petition and receipt of sole custody of his children in 2008; his care of the children under the chancery court’s temporary order, which granted him four out of seven days a week with his children, three out of every four weeks, for approximately a year and seven months; and his testimony at trial wherein he affirmed that he was asking the chancery court to award him sole legal and physical custody of the children. We disagree with the chancery court’s finding that the factor of “willingness to provide primary childcare” favors Julie Anne over Tony. Rather, we find that the factor favors neither party.
¶ 30. Additionally, in reference to the Albright factor of “stability of the home environment,” the chancery court stated that “[a]lthough the mother’s home prior to and immediately following the separation of the parties showed evidence of lack of care and cleanliness, after investigation by the Department of Human Services [ (DHS) ], it was found to be appropriate for the children.” This is blatantly incorrect. At oral argument, counsel for both parties admitted on the record that an investigation by DHS was never completed due to confusion as to Julie Anne’s proper address. Accordingly, any evidence indicating issues of cleanliness and safety at Julie Anne’s residence due to the dozens of dogs living on the property, including breeds with dangerous propensities, and in the house has yet to be negated. Because the chancery court declined to extend the temporary order’s restriction on the number and weight of dogs allowed in the portions of Julie Anne’s house used by the children, we are uncertain as to the current conditions within Julie Anne’s home.
¶ 31. Furthermore, regarding Tony’s parental involvement, the record indicates that after the parties’ separation, Tony took an active, primary role in the children’s health. The record shows that the parties’ daughter suffers from asthma and was prescribed both an inhaler and prescription medication. In his brief, Tony expresses concerns over Julie Anne’s care of their daughter’s asthmatic problems due to Julie Anne’s unilateral decision to discontinue administration of one of the asthma medications. While Julie Anne testified that her daughter’s treating physician did not state that administration of the medication was mandatory, discontinued use of the medication was also not specifically ordered. Furthermore, Julie Anne admitted at trial that she had not taken her daughter to the doctor for an asthmatic follow-up appointment in some time.
¶ 32. The record also reflects that prior to Tony’s taking the children to the doctor, neither child had been to see a doctor for a physical wellness checkup in approximately four years. In response to this allegation, Julie Anne merely references the chancery court’s determination that the children “suffer from no illnesses or disabilities which would require special care for which either party may be more qualified.” However, Julie Anne has yet to explain the extensive time lapse in the children’s receipt of wellness checkups.
¶ 33. We have determined that the chancery court’s Albright analysis was flawed and that the factors of “continuity of care,” “best parenting skills,” and “stability of home environment” favor neither Tony nor Julie Anne, which places both parties on a level playing field with regard to the question of custody. While Julie Anne’s self-employment and role in the *36 children’s lives prior to the parties’ separation support her adequacy as a parent; a thorough review of the record presents us with serious questions as to the safety of the Cuccias’ children at Julie Anne’s residence due to the unrestricted presence of numerous dogs on the property and in the residence. Additionally, the record indicates that prior to the chancery court’s final judgment, Tony played an active parenting role, especially in the area of the children’s health. Tony exhibited excellent parenting skills and the capacity and willingness to care for his children.
¶ 34. Having reviewed all of the evidence in the record and all submissions on appeal, we find that the chancery court committed reversible error in granting Julie Anne sole legal and physical custody of the children. We conclude that the chancery court’s original temporary order was a proper adjudication of the issues. Accordingly, we reverse the chancery court’s final order regarding custody of the parties’ children and render joint legal and physical custody of the children to Tony and Julie Anne. However, we are not in a proper position to determine the specifics of each party’s physical custody time-divisions, including weekly schedules as well as special occasions and vacations. Thus, we charge the chancery court with this determination on remand.
¶ 35. Furthermore, for the safety of the children, we must restrict Julie Anne’s ability to allow dogs of any number and weight to roam loose or occupy any portion of her residence utilized by the parties’ children as living space. We recognize that we are unfamiliar with the layout of Julie Anne’s current residence and the status of her business and rescue organization. As such, we remand this issue for the chancery court to enjoin Julie Anne accordingly.
¶36. As such, we reverse and render the chancery court’s determination as to custody of the parties’ children and grant joint legal and physical custody of the children to Tony and Julie Anne and enjoin Julie Anne as outlined above. We further remand the issues of the parties’ co-parenting schedules and Julie Anne’s enjoinment with respect to the dogs allowed in her residence for determination by the chancery court.

II. Consideration of Marital and Separate Property and Marital Debt

¶ 37. Tony alleges that the chancery court erred in classifying a work bonus he received in July 2008 as marital property because it was received outside of the marriage and was used to pay marital debt. Tony also notes that the chancery court failed to address the parties’ marital debt anywhere in its order. Tony further argues that the court incorrectly classified a residence purchased by Julie Anne after the parties’ separation as her separate property because it was obtained and paid for, at least in part, by Tony’s temporary support payments. We address these issues together.
¶38. The division of property in divorce cases is based upon law handed down through cases such as Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994) and Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). Horn v. Horn, 909 So.2d 1151, 1162 (¶42) (Miss.Ct.App.2005) (citation omitted). In dividing property, a chancery court must first determine which assets are marital property and, therefore, “subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.” Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss.1994) (quoting Hemsley, 639 So.2d at 914-15).
*37 ¶ 39. In the instant case, Tony received a bonus of approximately $43,460 as a result of his company’s exceptional performance. The record indicates that the bonus was not the result of Tony’s individual efforts or any specific work done by Tony during the marriage. Rather, the bonus was received outside of the marriage for reasons independent of Tony’s doing. Hence, it would appear at the outset that the bonus was improperly classified as marital property.
¶40. However, we have held that a party’s separate assets are considered part of the marital estate when commingled for the use of the family. Id. (citation omitted). Here, Tony testified that he used the bonus money to pay off some of the parties’ marital debt, as he had historically done in years past. In doing so, Tony commingled the funds and made his bonus money subject to the marital estate. Nonetheless, because the funds were used to pay off marital debt — including but not limited to the mortgage on the marital residence and the children’s tuition — Tony should not have been forced to somehow regain that amount and place it into a trust for division in the marital estate.
¶41. Additionally, Tony correctly points out to this Court that the chancery court failed to consider the parties’ marital debt in its analysis and conclusions. Although Tony testified as to the parties’ marital debt and submissions were made to the chancery court regarding this debt, the court did not take the debt into account when it divided up the marital estate. Julie;Anne correctly notes that this Court has previously affirmed a chancellor’s failure to consider marital debt that was sparse in nature. Glass v. Glass, 857 So.2d 786, 789 (¶7) (Miss.Ct.App.2003). Specifically, we held that the chancellor in Glass did not err in declining to consider marital debt because the chancellor was presented with a “lack of reliable information concerning the marital debts.” Id. In the present case, Julie Anne alleges that the marital debt in this case was “sparse” and that failure to consider the indebtedness is not reversible error. We disagree.
¶ 42. The record reflects that the parties accrued marital debt in various form's, including but not limited to credit-card debt, mortgage debt, and amounts owed for their children’s tuition payments. The debt in question was enough to warrant Tony’s historical practice of using his bonus money, most recently an amount in excess of $40,000, to pay off marital debt each year. We find this to be significant and remand the issue of marital debt for consideration in the chancery court’s conclusions.
¶ 43. Finally, the chancery court determined that the residence Julie Anne purchased for herself and the parties’ children after the sale of the marital residence was her separate property. The record reflects that on Julie Anne’s loan application, she listed her monthly income to be between $3,750 and $6,500 a month. This revenue was claimed to have been generated by Julie Anne’s self-employment. Julie Anne failed to note that $3,750 of her monthly income was the result of an award of temporary support from Tony. Julie Anne subsequently qualified for a loan of $200,000 and purchased a home. While Julie Anne did not list Tony’s support payments on the loan, it is clear that she commingled much of the $3,750 a month that Tony paid to her in temporary support in order to acquire the loan and pay her monthly mortgage.
¶ 44. We find the chancery court’s classification of Tony’s bonus, money paid toward marital debt as marital property and Julie Anne’s residence obtained by and paid for in large part by Tony’s temporary support payments as separate property to *38 be conflicting. If the payment of marital debt using funds acquired outside of the marriage results in the funds becoming commingled’ and therefore “marital,” should not the payment for property acquired outside of the marriage using marital funds end in the same result? At the very least, we see fit to deduct payments made by Tony with his bonus money for the reduction of marital debt and his payments of temporary support from any alleged deficit suffered by Julie Anne due to the parties purported monetary inequity. We therefore reverse and remand this issue for reexamination by the chancery court.

III. Tennessee Acreage

¶45. Tony next asserts that the chancery court erred in its award to Julie Anne of the monetary equivalent of one-half interest of acreage located in Tennessee. The property in question constitutes approximately one hundred acres of undeveloped woodland. Several years prior to the divorce proceedings, the land was deeded with joint ownership and rights of survivorship between Tony, Julie Anne, and Tony’s parents. The acreage was purchased for approximately $52,500 in 2001, and no improvements have been made on the land since that time.
¶ 46. Thé chancery court properly classified the acreage as marital property. However, the question arises as to whether the court was manifestly wrong in its valuation of the property and subsequent grant of the monetary equivalent of one-half interest of the property to Julie Anne. The record indicates that at least two appraisals were performed, but one of the initial appraisals was completed on the wrong property. The appraisal used by Tony valued the property at approximately $70,000 in 2009 with approximately $33,900 in mortgage debt, allowing net equity on the property in the amount of approximately $36,100. The appraisal used by Julie Anne totaled approximately $125,000 in 2009 with no mention of mortgage debt.
¶ 47. In the chancery court’s order, the court listed the property’s net equity as to Tony and Julie Anne’s interest in the property at $45,237. The chancery court further noted that the appraiser used by the court had been agreed upon by both parties. However, the chancery court did not explain the specifics of the appraisal used or the amount of debt held on the property. Nonetheless, a simple mathematical calculation indicates that the court utilized the appraisal which valued the property at approximately $125,000, almost three times the amount for which it was purchased in 2001, subtracted the mortgage debt enunciated by Tony of $33,900, and then divided that amount in half to reflect the parties’ interest apart from Tony’s parents’ half-interest in the property’s total net equity.
¶ 48. Although we question the significant increase in value to land, which was never improved upon and which was evaluated during an economic downturn, we cannot say that the chancery court was manifestly wrong in its analysis. The chancery court merely utilized figures given to it by an appraiser who the parties had previously agreed to use. This issue is meritless.

IV. Rehabilitative Alimony

¶ 49. Tony’s final assignment of error references the chancery court’s award of rehabilitative alimony to Julie Anne in the amount of $2,000 a month for forty-eight months. In the chancery court’s opinion, the court stated that it primarily used the case of Cheatham v. Cheatham, 537 So.2d 435 (Miss.1988), in deciding the issue of rehabilitative alimony. While the benchmark case of Cheat- *39 ham was a proper legal standard, the chancery court did not expand upon its analysis of the instant case under Cheat-ham. Instead the chancery court simply stated: “Applying the factors as set forth in Cheatham v. Cheatham, the Court determines that there is a great disparity in the current incomes of the respective parties.”
¶ 50. Although Julie Anne argues that the award of rehabilitative alimony was not meant to be an equalizer between the parties, the chancery court’s brief statement above indicates that the court’s reasoning for awarding alimony was, in fact, to balance out a purported income disparity between Tony and Julie Anne. However, a review of the record indicates that in addition to receiving various personal property, Julie Anne has received the following amounts since the parties’ separation: undisclosed proceeds from the sale of the marital residence; undisclosed amounts prior to the sale of the marital residence in rent, utilities and gas expenses; $1,000 from the sale of a tractor; $2,000 for moving expenses; awards for attorneys’ fees totaling several thousands of dollars; over $61,000 in temporary support; approximately $90,000 in alimony; one-half of Tony’s undisclosed retirement account balance; and $46,102 for Julie Anne’s interest in of the Tennessee acreage, the sale of a camper, and half of Tony’s bonus money acquired in July 2008. This totals well over $200,000.
¶ 51. In addition to the amounts listed above for personal maintenance, Julie Anne receives $1,458 a month in child support, with a total of almost $30,000 paid by Tony since the parties’ divorce. Julie Anne also maintains a private business that generates a varied income. However, Julie Anne testified that her business supported payment of business-related expenses in the amount of approximately $1,700 a month. Julie Anne also noted on her loan application that her monthly income approximated between $3,750 a month and $6,500 a month. Even excluding Tony’s payment of temporary support at the time of Julie Anne’s loan application, it would appear from Julie Anne’s assertions in her application that she generated a maximum of $2,750 a month outside of Tony’s payments to her.
¶ 52. We must also note that Tony’s motion to modify the temporary support award to Julie Anne was never addressed by the chancery court. Tony’s motion was a request for the chancery court to modify his payments to Julie Anne given his $75,000 reduction in income. Tony’s annual salary was lessened to approximately $129,000, and remains so today. However, the chancery court did not address Tony’s drop in salary in its opinion or in the final divorce decree.
¶ 53. Tony asserts that his monthly expenses are too great for him to meet all of his required payments for himself, his children, and Julie Anne. A glance at Tony’s monthly monetary responsibilities reflects numerous expenses including various types of insurance for himself and his children; loan payments based on his replacement of the 2008 bonus money used to pay off marital debt; tuition payments for his children; child support; alimony; and personal expenses such as rent, utilities, food, gas, and car payments. Given Julie Anne’s awards to date, her personal income, and Tony’s cumbersome monthly obligations, we find that the chancery court’s award of alimony was manifestly erroneous. Accordingly, we reverse and remand this issue for reexamination by the chancery court.
CONCLUSION
¶ 54. After a thorough review of the record, we find that the chancery court’s *40 determination as to custody and visitation was manifestly wrong. We reverse and render joint legal and physical custody to Tony and Julie Anne. We remand the issue of a co-parenting schedule as to each party’s division of the time allotted for physical custody for determination by the chancery court. We further find that the chancery court erred in failing to enjoin Julie Anne from allowing an unrestricted number and weight of dogs in the parts of her residence occupied by the parties’ children. We remand this issue for reexamination by the chancery court, as well.
¶ 55. We also find that the award of half of Tony’s bonus money to Julie Anne was manifestly wrong. Although said money was separate property at its receipt, the money was commingled by Tony when he used it to pay off marital debt, as he had historically done for many years during the marriage. However, since the money was used to pay off marital debt, Tony should not have been forced to replace the money and enter it into a trust for division with the marital estate.
¶ 56. Additionally, Julie Anne’s purchase of property outside of the marriage while using marital funds may have been improperly classified as separate property. It is possible for such property to have been deemed marital due to commingling since the funds used to acquire and then pay for the property could be considered, at their core, marital in nature.
¶ 57. Furthermore, the chancery court’s failure to consider the parties’ marital debt anywhere in its analysis was manifestly erroneous given the substantial marital debt acquired by the parties. Therefore, we remand the issues of classification of Tony’s bonus money, classification of Julie Anne’s residence, and consideration of the parties’ marital debt for reassessment by the chancery court.
¶ 58. Additionally, although it is curious that unimproved land would almost triple in value over a period of eight years in the current economy, we cannot find manifest error in the chancery court’s valuation of the parties’ Tennessee acreage. The parties agreed upon the appraiser used to generate the appraisal, and the chancery court adhered to the parties’ wishes. As such, we affirm the chancery court’s valuation of the Tennessee acreage.
¶ 59. Finally, we find manifest error in the chancery court’s award of rehabilitative alimony to Julie Anne. The chancery court based its award on a determination that there was great disparity in the parties’ incomes. However, the court did not expand upon its analysis of the legal considerations for an award of rehabilitative alimony. A review of the record indicates that Julie Anne has received over $200,000 from Tony since the parties’ separation, notwithstanding Tony’s monthly payments of $1,453 in child support. The record further shows that Julie Anne generates income between $1,700 a month and $2,750 a month from her personal business. Finally, the court failed to address Tony’s monthly obligations and his marked salary decrease. As such, we cannot agree with the chancery court’s blanket assertion that Julie Anne is entitled to alimony. We reverse and remand this issue for reassessment by the chancery court.
¶ 60. THE JUDGMENT OF THE DE-SOTO COUNTY CHANCERY COURT IS AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
*41 LEE, C.J, GRIFFIS, P.J, MYERS AND BARNES, JJ, CONCUR. ROBERTS AND MAXWELL, JJ, CONCUR IN PART AND IN THE RESULT. CARLTON, J, CONCURS IN RESULT ONLY. IRVING, P.J, AND RUSSELL, J, NOT PARTICIPATING.

. As stated in Hamilton v. Hamilton, 755 So.2d 528, 530 n. 1 (Miss.Ct.App.1999), "[t]he Farese Visitation Schedule is a model originating from chancery districts in north Mississippi. While the schedule has been referred to [in] Mississippi case law, ... chancellors are vested with the authority to use their discretion in regard to the circumstances of the parties and the nature of the case in fashioning visitation schedules.” (Internal citations omitted).